**IN THE COURT OF APPEALS OF IOWA**

No. 15-1318
Filed September 23, 2015

**IN THE INTEREST OF I.H., J.F., AND S.F.,**
**Minor Children,**

**K.F., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Franklin County, Peter B. Newell, District Associate Judge.

A mother appeals from an order terminating her parental rights. **AFFIRMED.**

Larry W. Johnson of Walters & Johnson, Iowa Falls, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, and Brent Symens, County Attorney, for appellee State.

Randy D. Johansen, Sheffield, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J, and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

A mother appeals from an order terminating her parental rights to her children, I.H., born in 2002;[1] J.F., born in 2006; and S.F., born in 2008.[2] The children were removed from the mother's custody in January 2014 as a result of her failure to provide proper supervision of her children and their exposure to harm. Because we find the State made reasonable efforts to reunify this family, we affirm the termination of the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) (2015).

**I. Background Facts.**

About November 10, 2012, the mother left the younger two children (ages six and four) home alone in the early morning hours while she traveled out of town to see an ex-boyfriend. She called her mother about 5 a.m. to tell her the children were at home alone. The oldest child was staying with maternal grandmother at the time. A child abuse assessment was conducted and resulted in a finding the mother had denied the children critical care. During that assessment, it was learned there were concerns about the mother's mental health and the children's excessive absences from school. The department of human services (DHS) began providing services to the family.

In April 2013, another child abuse assessment was conducted after the youngest child was discovered unsupervised and attempting to cross a highway on a bicycle. Again there was a finding of denial of critical care.

---

[1] The father of I.H. moved out of state some time ago. His parental rights were terminated pursuant to Iowa Code section 232.116(1)(b) and he has not appealed.
[2] The father of J.F. and S.F. consented to the termination of his parental rights and he is not involved in this appeal.

The children were adjudicated children in need of assistance (CINA) on May 20, 2013. At the time of the adjudication hearing on April 29, the mother and children were living with the mother's parents. The mother was unemployed. She testified at the adjudication hearing that she had been diagnosed with major depression and was taking Prozac and meeting with a therapist. She also testified that regarding the incident where she left the children alone, she had been taking Ambien and did not remember what happened. The court ordered the mother to participate in a mental health evaluation and follow any recommendations for treatment. The children were also ordered to participate in counseling.[3] Following the CINA adjudication, Family Safety, Risk, and Permanency services (FSRP) continued to be offered. In addition, Monarch Therapy Services came to the home weekly to provide Behavioral Health Intervention Services (BHIS) to the children.

On January 21, 2014, the youngest child again was found unsupervised near a roadway. The temperature was six degrees and the child was not adequately clothed. His feet and hands were wet, and he was so cold he was unable to speak to the teacher who found him. On January 22, 2014, an application for an ex parte order of temporary removal asserted,

> On 1/22/14 DHS attempted to speak with [the mother] regarding these concerns. [The mother] became upset, yelling hysterically and using profanity. The situation escalated when [I.H.] threw a chair and pushed his grandmother to try to leave the home. [The mother] refused to cooperate and denied the allegation with [S.F.] There are ongoing concerns with [the mother's] mental health and lack of treatment. The children have missed 50 days or more of school. This is the third incident of denial of critical care for supervision since services began.

---

[3] J.F. had been diagnosed with disruptive behavior disorder.

The children were removed from the mother's care and placed in foster care. That removal was confirmed by an order dated February 10, 2014, in which the court found the children in "imminent danger of harm as a result of lack of supervision being provided by the mother." Services were to continue.

A May 19, 2014 review order noted the mother "has not followed through with participating in therapy," had been difficult to communicate with regarding her children's medical and dental needs,[4] and had "continued to demonstrate that she has difficulty coping with her own mental health issues." The court ordered that FSRP and BHIS services continue and that the mother participate in any recommended mental health treatment.

The mother has sought and received rental assistance and case management services from Bridge of Hope.[5] A September 8 report from that organization noted the mother had been unable to refill prescribed mental health prescriptions for a variety of reasons and had struggled with her emotional stability, summarizing:

> As reported in August, [the mother] continued to have great difficulty in managing her emotions which has been observed to be the most significant barrier in her progress. All aspects of the success in the Bridge of Hope program are directly contingent on her emotional stability. It is believed that if [the mother's] emotional well-being can be achieved and maintained that she will be able to demonstrate progress and move forward on her goals.

---

[4] The court wrote that the mother informed S.F. not to take medication prescribed for his bed-wetting "because she did not approve of it."

[5] On September 8, 2014, the organization filed a report, which states it "provides rental assistance and case management services to single women and their children in achieving family stability . . . through job training, employment and budgeting, life-changing friendships, increased self-esteem, and growth in the areas of holistic living." The organization develops an individualized case plan with each family.

It was also noted that the mother had seen a psychiatrist on August 26 and had her medications adjusted.

A September 8, 2014 review order related the following:

The court received a report from the Department of Human Services dated August 26th, 2014. The court advised that [the mother] has had difficulties during visits regulating her emotions. During a family team meeting, [the mother] felt overwhelmed and had to walk out. During a meeting on August 19th, 2014, [the mother] again lost her temper and used profanity towards the service provider. She later threatened to kill herself with a knife. [The mother] was inappropriate with [J.F.] during a phone call on the 19th of August. After the conclusion of today's hearing, [the mother] became upset and stormed out of the courtroom.

The mother was again ordered to participate in recommended mental health treatment.

Another review hearing was held on December 8, 2014. The review order continued placement of the children outside the home. The court stated the mother continued to reside with her parents and participate in the Bridge of Hope program. The review order observed DHS had reported that during a November 4 visit, the mother told two of her children she was going to kill herself. However, the mother denied threatening self-harm. The court noted visits "are chaotic because the children do not respect [the mother's] authority or her rules" and further that the mother "struggles to demonstrate consistency in routine, rules and consequences" and "continues to demonstrate difficulty regulating her emotions."

A permanency hearing was held on February 16, 2015, at which it was reported the mother was not currently participating in any individual mental health therapy though diagnosed with general anxiety disorder, major depressive

disorder, and parent/child problems. "[V]isits continue to be problematic." The State indicated it intended to file a petition to terminate the mother's rights. The mother sought to continue the permanency hearing and obtain further time to have the children returned to her. The court wrote:

> The court personally addressed [the mother] and advised her that in order for the children to be returned to her care, custody and control, she would have to participate in individual mental health treatment. She would be required to show during visitation that she could regulate her emotions and provide consistent discipline and supervision of these children. [She] would also have to establish some financial stability.

The court also found DHS "has made reasonable efforts to return these children to the care, custody and control of their mother," to "finalize a permanency plan," and "to achieve the permanency goal."

In a Foster Care Review Board report dated April 2, 2015, the DHS worker reported that the mother asked her mental health provider for family therapy, but the "therapist stated that they are not anywhere near ready to begin family therapy at this time."

On April 8, 2015, a petition to terminate the mother's parental rights was filed. On June 8, the mother requested the termination hearing be continued and she be granted an additional six months to effectuate reunification. However, the termination hearing was held on June 18 and, on July 20, the juvenile court terminated the mother's parental rights. She now appeals.

**II. Scope and Standard of Review.**

Our review of termination decisions is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We give weight to the juvenile court's findings, especially assessing witness credibility, although we are not bound by them. *In re D.W.*,

791 N.W.2d 703, 706 (Iowa 2010). An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116 (2015). *Id.* Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from the evidence. *Id.*

**III. Discussion.**

Review of a termination order is a three-step analysis. *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). First, we determine "if a ground for termination exists under section 232.116(1)." *Id.* Second, we determine whether termination is in the child's best interests as described section 232.116(2). *See id.* Lastly, we consider whether the mitigating factors enumerated in section 232.116(3) persuade us not to terminate the parent's rights. *See id.*

The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(f). That section allows the termination of parental rights if a child four years of age or older has been adjudicated a CINA, has been out of the parent's custody for at least twelve of the last eighteen months or the previous twelve consecutive months, and cannot be returned to the parent's custody at the present time. Iowa Code § 232.116(1)(f). The mother does not contest that the children are all over the age of four, have been adjudicated CINA, have been out of their mother's custody for the requisite period (since January 22, 2014), and could not be returned to her care at the time of the termination proceeding. However, the mother asserts on appeal that the State failed to make reasonable efforts to reunify her with her children. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("The State must show reasonable efforts as a

part of its ultimate proof the child cannot be safely returned to the care of a parent.").

Our laws relating to child welfare require DHS

to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(7); *see also In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App.1996); *In re A.Y.H.*, 508 N.W.2d 92, 95 (Iowa Ct. App.1993). The concept covers both the efforts to prevent and eliminate the need for removal. Iowa Code § 232.102(10)(a). The focus is on services to improve parenting. *In re T.A.L.*, 505 N.W.2d 480, 485 (Iowa 1993). However, it also includes visitation designed to facilitate reunification while providing adequate protection for the child. *M.B.*, 553 N.W.2d at 345.

*Id.*

The mother contends she has made strides toward financial and housing stability. She argues the State has failed to provide semi-supervised or unsupervised contact with the mother to allow her to demonstrate her progress and show she is capable of adequately supervising the children. She disputes the court's findings that she needs mental health therapy.

After the children were removed from the mother's custody, the family continued to receive services, including FSRP and supervised visits with the children. In October 2014, the mother was having two semi-supervised visits with the children per week. However, on November 6, 2014, the oldest child informed his mother he did not wish to live with her and the mother told the younger two children she wanted to kill herself. Visits were again fully supervised thereafter. Services have been offered to the mother for more than two years. The mother has not accepted responsibility for her lack of progress toward reunification.. She is resistant to parenting suggestions. In January 2015,

after failing to show for several appointments, the mother participated in a mental health evaluation. She was diagnosed with generalized anxiety disorder, major depressive disorder, and a parent-child relational problem. It was recommended that she participate in individual therapy for a time before then participating in family therapy. The mother is prescribed mental health medications (Prozac and Wellbutrin) but failed to attend medication follow-up appointments in April and May 2015. The mother is not participating in mental health therapy consistently, asserting she is not in need of mental health treatment. When angry, the mother has a history of a lack of self-control—she has walked out of court hearings and family team meetings. In May 2015, she was charged with assaulting her own mother over a disagreement about a television. This is not a picture that conveys confidence in the mother's ability to parent her children safely.

"While we recognize the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." *Id.* at 494 (citation omitted). "The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987). The legislature incorporated a twelve-month limitation for children in need of assistance aged four and up. *See* Iowa Code § 232,116(1)(f). "The purpose of these limitations 'is to prevent children from being perpetually kept in foster care and to see that some type of permanent situation is provided for the children.'" *C.B.*, 611 N.W.2d at 494. "Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency." *Id.* As our courts have noted before, "insight for the determination of

the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" *Id.* (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981)).

Each child was behind academically upon arriving at foster care. They have suffered emotionally from their mother's neglect. The children have been provided mental health services and extra educational assistance. While we acknowledge there is a bond between the mother and children, the children are thriving in their current placements; they need and deserve permanency. Under the circumstances presented, we affirm the termination of the mother's parental rights.

**AFFIRMED.**